Henry J. Sontag et al., Appellants, v. New York Life Insurance Company, Appellee.

Gen. No. 41,033.

Heard in the third division of this court for the first district at the December term, 1939. Opinion filed May 22, 1940. Rehearing denied June 14, 1940.

JOSEPH T. TYRRELL and McCARTHY & TOOMEY, all of Chicago, for appellants; FRANK A. McCARTHY, JOSEPH T. TYRRELL, JOHN E. TOOMEY and JAMES C. O'BRIEN, JR., of Chicago, of counsel.

WILLIAM N. MARSHALL, JOHN F. DENISSEN, KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, HAROLD L. REEVE and EDMUND J. REYNOLDS, all of Chicago, for appellee; JOSEPH B. FLEMING and THOMAS B. MARTINEAU, both of Chicago, of counsel.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is a chancery action by the plaintiffs seeking to compel an accounting by the defendant and to determine the surplus arising out of the foreclosure of two mortgages secured by real estate owned by the plaintiffs. The master recommended the entry of a decree in accordance with the prayer of the complaint. The chancellor sustained the defendant's exceptions, dismissed the suit for want of equity and entered judgment for costs against the plaintiffs.

The allegations of the complaint are in substance that the defendant foreclosed two mortgage trust deeds made by the plaintiffs conveying certain real estate in

Chicago; that the foreclosure sale of May 1, 1935 resulted in a deficiency of $15,725.01; that before the mortgage loans were made, plaintiffs had leased the mortgaged premises to the United Cigar Stores Company of America for a term of 99 years, commencing November 1, 1922; that at the time the mortgage loans were made, plaintiffs assigned all interest in this lease to the defendant "as further security for the indebtedness, subject to the condition that plaintiffs should have the exclusive right to enforce its provisions as long as no defaults exist under the covenants of the trust deed"; that United Cigar Stores Company became a voluntary bankrupt in the United States District Court for the Southern District of New York; that the trustee in bankruptcy and the plaintiffs on December 12, 1932, entered into a written agreement terminating the 99-year lease and assigning to the plaintiffs all of the bankrupt's interest in the lease and sub-leases thereunder; that by this agreement the plaintiffs reserved the right to file against the bankrupt estate "any provable claims to which the bankruptcy court might adjudge the landlords are entitled under the terms of the lease. . . . . ''; that on February 20, 1933, the plaintiffs filed their claim in the bankruptcy proceeding for $39,765.15, representing the taxes which the bankrupt had not paid for the years 1928–1932 inclusive; that on October 3, 1933 this claim "was reduced by the bankruptcy court to $19,765.15 and allowed for that amount"; that thereafter a dividend of 20 per cent amounting to $3,953.03 was paid to "plaintiffs' assignee Dilworth"; that on April 6, 1934, the defendant New York Life Insurance Company intervened in the bankruptcy proceeding and petitioned the court for "entry of an order requiring the trustee to pay remaining dividends on the claim to the defendant by virtue of the assignment of the lease . . . ''; that on June 14, 1934, proceedings for reorganization of the bankrupt under section 77B of the Bankruptcy Act were instituted in the same federal court;

that the New York Life Insurance Company on September 15, 1934, filed a claim in this proceeding for $69,000; that the plaintiffs filed a claim for $108,204.46; the plaintiffs filed this claim on October 9, 1934; that objections were filed to both claims by the bankruptcy trustee and by intervening creditors; that thereafter the plaintiffs, defendant and Dilworth entered into the agreement to which we have referred whereby, among other things, the plaintiffs and Dilworth conveyed to the defendant the half interest in the bankruptcy and reorganization claims; that the agreement was made "solely for the further security of payment of indebtedness secured by the two mortgages; that the defendant having realized payment on its total indebtedness, it is in equity and law bound to pay over to the plaintiffs any surplus over and above its indebtedness."

The answer of the defendant admits the making of the agreement but denies that it was made for security; alleges it was a settlement contract finally settling controversies and litigation between the parties and the county collector and absolutely dividing the bankruptcy and reorganization claims; alleges it has been fully carried out and performed by all parties, including the defendant; and denies the plaintiffs are entitled to any relief from the defendant.

It further appears that under the terms of the 99-year lease the United Cigar Stores Company, lessee, was obligated to pay all taxes levied against the mortgaged premises, in addition to the cash rental. It paid a part of the taxes for 1928 and 1929, but, when it became a voluntary bankrupt, it had failed to pay the remainder of those taxes, or taxes for 1930–1932 inclusive, and did not pay any of the taxes for these years and thereafter.

Plaintiffs covenanted in the trust deeds securing the mortgage loans from the defendant to pay all taxes, and the taxes were not paid. It also appears that the defendant was not a party to the agreement between

the plaintiffs and the bankruptcy trustee dated December 12, 1932, whereby the 99-year lease was terminated and the trustee assigned to the plaintiffs the lessee's interest in the lease and subleases thereunder, of which agreement the defendant in this action had no notice.

The agreement entered into by the parties on June 25, 1935 is to be considered by this court as to whether it is conclusive of the rights of the parties and as to whether it governs and decides the case, and warranted the dismissal of plaintiffs' suit for want of equity. The parties to the agreement were the plaintiffs, first parties, Dilworth, second party, and the defendant, third party. The contract contained the following recitals and provisions, which we have incorporated in full in this opinion:

"That whereas plaintiffs on February 20, 1933 had filed a claim against the bankrupt, United Cigar Stores Company of America, in a proceeding in which the United States District Court for the Southern District of New York, in the amount of $39,765.15, for unpaid taxes for the years 1928–1932 inclusive, due under a lease dated August 31, 1922, between the plaintiffs as lessors and the bankrupt as lessee; whereas the plaintiffs had assigned this claim to Dilworth on September 8, 1933, whereas the claim had been reduced to $19,765.15, and allowed in that amount, by an order entered October 3, 1933; whereas a first dividend of 20% had been received on this claim by Dilworth on October 5, 1933; whereas the defendant on March 1, 1934, filed suit (in the Circuit Court of Cook County, Illinois) to foreclose plaintiffs' two mortgages to the defendant in the aggregate principal amount of $100,000; whereas the defendant on April 9, 1934, had applied by petition in the bankruptcy proceeding (in the New York federal court) to restrain the payment of further dividends on the above claim to plaintiffs or to their assignee, and to require the bankruptcy trustee to pay any further dividends to the defendant; whereas

defendant's said petition was still pending and undetermined in the bankruptcy proceeding; whereas the Cook County Collector had also applied to the bankruptcy court by petition on April 27, 1934, to compel the payment of further dividends on said claim and any further amounts due by virtue of the lease, to him; whereas said petition of the County Collector was still pending and undetermined; whereas second and third dividends aggregating 30% had been authorized in the bankruptcy proceeding on June 14, 1934, but had not yet been paid on the above controverted claim; whereas a petition for reorganization of the bankrupt under Section 77B had been filed in the same federal court on June 14, 1934; plaintiffs had filed claim in that proceeding for $108,204.06 on October 9, 1934, for damages resulting from the bankruptcy trustee's rejection of the lease; the defendant had filed claim on September 15, 1934, for $69,000 for damages resulting from the rejection of the lease; objections had been filed by the bankruptcy trustee and by interveners to both claims; and

" 'Whereas the parties hereto desire to settle any and all conflicting claims with respect to said bankruptcy claim and with respect to said reorganization claim.'

"Therefore, in consideration of the mutual promises and covenants hereinafter set forth, and in consideration of One Dollar, etc., 'it is hereby agreed as follows:'

"That Dilworth and the defendant 'shall share equally' all dividends and proceeds of the bankruptcy claim, exclusive of the dividend already paid to Dilworth, which the defendant agreed 'Dilworth may retain free and clear of any claims or liens asserted by the company (the defendant) or the County Collector, and to the intent and purpose that the company shall receive 50% of all dividends and proceeds of said bankruptcy claim, with the exception of the first dividend of 20% already paid to and received by Dilworth, Dil-

worth hereby assigns, transfers and conveys to the company a one-half interest in and to the said bankruptcy claim;' that the company should obtain from the County Collector a stipulation, in which Dilworth should also join, and consent orders, withdrawing both the County Collector's and the defendant's petitions of April 6th and April 24, 1934, 'and confirming the assignment by Dilworth to the company of a one-half interest in said bankruptcy claim as aforesaid;' that the plaintiff and the defendant 'shall share equally all dividends and proceeds of said reorganization claims and to the intent and purpose that the company (the defendant) and the Sontags shall each receive fifty per cent of all dividends and proceeds of said claims, the Sontags and the company do hereby respectively assign, transfer and convey each to the other a one-half interest in and to their respective claims;' that the plaintiffs and the defendant should file a stipulation and procure entry of an order in the reorganization proceeding, consolidating their claims 'and directing that all dividends and proceeds of the consolidated reorganization claims be shared equally' by them; that plaintiffs and the defendant should join in opposing all objections to their claims by other persons; that all parties to the contract should pay their own counsel fees and expenses 'out of the respective shares received by them;'

"The contract further provided, with reference to the deficiency decree against the plaintiffs and in favor of the defendant in the Illinois foreclosure suit, that the defendant would not pursue any such decree against the plaintiffs personally, although it might obtain the appointment of a receiver in the foreclosure suit for the purpose of collecting the rents of the mortgaged premises during the redemption period; that at the end of the redemption period, the company undertook to execute and deliver to the plaintiffs a satisfaction of any such deficiency decree and a general release of all claims of defendant against the plaintiffs 'based upon or aris-

ing out of said mortgages;' and further, the defendant obligated itself, at any time during the redemption period and on written request of the plaintiffs to execute and deliver to them a release of the lien of the deficiency judgment on any other real estate 'belonging to or standing in the name of the Sontags.'

''The contract concluded that the parties would 'execute any and all other papers and perform any and all other acts as may be necessary or proper to carry out the terms, covenants and conditions contained herein.' ''

The stipulations which the contract called for were filed shortly thereafter. These were signed by the attorneys representing the plaintiffs and Dilworth, the defendant and the collector. One of them provided among other things that the defendant should apply all amounts it received from both claims to payment of the taxes to the collector.

The plaintiffs are not attacking or attempting to set aside the agreement of June 25, 1935, but are contending that it does not relieve the defendant from applying what money it received from this property on the mortgage debt, and if the plaintiffs made no effort to sequester the proceeds of these claims and the defendant was successful in collecting the entire amount, it would obviously be necessary for the defendant to give the plaintiffs proper credit. The fact that the defendant collected only 50 per cent of the entire claim certainly does not change this principle unless the plaintiffs expressly waived the right to apply the same on the debt. In other words, the plaintiffs are not asking that the agreement be set aside or rescinded, but rather that it be enforced strictly in accordance with its terms, that the defendant receive one-half the amount of each claim, but after receiving its portion the same should be applied on the debt, and if there is then a surplus it should account and pay over the same to the plaintiffs. And finally the plaintiffs state that necessarily, therefore, we come again to the written agreement to ascer-

tain what rights the parties retained and what rights they bargained away. So, when we come to consider this agreement, we are to take into consideration the situation of the parties. The defendants call our attention to the following:

"(a) The foreclosure proceedings had been terminated by the entry of a decree of sale on April 4, 1935;

(b) The real estate had been purchased by defendant for $110,600.00 at the foreclosure sale on May 1, 1935;

(c) The master's report of sale had been approved and a deficiency decree for $15,725.01 and interest from May 1, 1935 had been entered on May 15, 1935 in favor of defendant;

(d) The receiver in the foreclosure proceedings had been continued until the further order of the court;

(e) In the bankruptcy proceeding was pending the petition of the County Collector to restrain further payments of dividends on the bankruptcy claim to Dilworth or plaintiffs and asking that such dividends be paid to the petitioner to apply on unpaid taxes;

(f) In that proceeding was also pending the petition of defendant to likewise restrain further payments of dividends and seeking to have such dividends paid to defendant;

(g) In the reorganization proceeding plaintiffs had filed their claim for damages for rejection of the 99-year lease by the bankruptcy trustee;

(h) Likewise, defendant had filed its claim in said proceeding for rejection of said lease;

(i) Defendant was contending that it was the absolute owner of the bankruptcy and reorganization claims and entitled to all the damages recoverable in said bankruptcy and reorganization proceedings as the assignee of the reversion and as mortgagee after condition broken;

(j) Plaintiffs were contending that defendant had no right to the claims because it had not resorted to its remedies until after rejection of the lease;

(k) Objections had been filed by the trustee and

others to the claims of defendant and of plaintiffs.''
And it is contended that by the agreement, they finally
settled all of these matters as to which there was still
any controversy, namely the matters in the bankruptcy
and reorganization proceeding involving the title to the
claims against the bankrupt and the right to receive the
dividends thereon.

The plaintiffs argue that some importance is to be at-
tached to the fact that the parties did not recite an in-
tent to ''settle the foreclosure suit,'' in addition to the
controversies in the bankruptcy court. Answers to
this argument are that there were no issues then pend-
ing in the foreclosure suit which had gone to decree,
sale, approval and deficiency decree; that it is not es-
sential that parties settle all matters pending; they can
settle any one or more they specify, as they clearly did
here; that the primary purpose of the agreement was
to settle the controversies in the bankruptcy court, but
that the plaintiffs requested in addition and the defend-
ant granted a release of the foreclosure deficiency judg-
ment in the foreclosure suit; that the agreement was
proposed and drafted by the plaintiffs and their at-
torneys, and will be construed most strongly against
the drafters.

After some discussion of the subject between the par-
ties, it appears that the defendants agreed to the sug-
gestions made by the plaintiffs, and the agreement was
drawn and approved by Samuel Ross Ballin, the plain-
tiffs' attorney.

The defendant cites authorities upon the right of the
plaintiffs to question the provisions of the contract, one
of which cases is somewhat similar to the case we have
in this court, namely, *Compton v. Johnson,* 240 Ill. 433.
That was a bill by Compton to have a certain deed de-
clared a mortgage. Compton had been the owner of
200 acres of land and had mortgaged it to one Andrus
to secure $3,200. The mortgage had been foreclosed
and the premises sold to Andrus. On the last day of

the redemption period, plaintiff did not have the funds with which to make redemption. After conversations between Compton and the defendants, the defendants redeemed the property, paying $4,763 to the master. At the same time they requested and received from Compton a deed to the property. Compton claimed this deed was to secure repayment of the redemption price, and therefore was a mortgage. The defendants denied the deed was given as security, and defended on the further ground that the plaintiff had sued them previously, that the suit had been terminated by a settlement and compromise, in a transaction wherein the defendants had conveyed to the plaintiff 80 acres of the land, and plaintiff had agreed to permit the deed he had given them to be and become absolute as to the remainder of the land. The master found for the plaintiff on the first point, that the deed had been given to secure defendants' advances at the time of the redemption, and had therefore been a mortgage. But the master further found that a settlement and compromise had been made, as contended by the defendants. The chancellor sustained the master's findings, and decreed accordingly, and the decree was affirmed by the Supreme Court. That court said the case presented a remarkable state of affairs, that the plaintiff had made a remarkably bad bargain but that there being no evidence showing he was mentally unsound, the compromise and settlement contract must stand and the court would not go behind it, saying in part:

"The defendants . . . rely upon the settlement and compromise made while the (former) suit was pending, in 1899. The master found and reported that the deed to the north half . . . was . . . delivered by them (defendants) to complainant and accepted by him in full satisfaction and discharge of all matters in controversy between him and said defendants regarding the transaction of the conveyance of the two hundred acres to Johnson and Avery. The court found and recited the

same thing in the decree. . . . The weight of the proof tends to support these findings, and although it was an absurd settlement for complainant, yet if he agreed to it, courts are powerless to set it aside.''

So, when we come to consider the agreement which we have before us, the settlement between the plaintiffs and their assignee and the defendant is binding upon them, and even if it were not a settlement that was fair, or in other words a bad bargain from the plaintiffs' point of view, the contract was binding. However, from a determination of the facts as they are presented, the plaintiffs did not make a bad bargain. They eventually received from the bankruptcy trustee the amount appearing in the record as the result of the claims of the parties to the litigation, and as we all understand, the courts encourage compromise, as is stated in the case of *Bingham v. Browning*, 197 Ill. 122, where it was said: ''Compromises are to be encouraged because they promote peace, and when there is no fraud and the parties meet on equal terms and adjust their differences, the court will not overlook the compromise but will hold the parties concluded by the settlement.''

As we have indicated, the plaintiffs are not seeking to attack or attempting to set aside the agreement, but are contending that certain moneys that were received by the defendant are to be accounted for. Under the circumstances as we have them before us, the contract is conclusive upon the questions arising upon this record.

The plaintiffs contend that the master properly considered evidence in order to determine whether the agreement was a settlement of all matters in dispute between the parties, and in support of this proposition state that the agreement of June 25, 1935, being silent on the question of whether the plaintiffs are entitled to credit on the mortgage indebtedness for whatever sums of money are realized on the bankruptcy and reorganization claims, it was necessary and proper for the

master to consider evidence on this important matter which the agreement failed to mention, citing the case of *Fuchs & Lang Mfg. Co. v. Kittredge & Co.,* 242 Ill. 88, where the court said:

" ... The rule is a familiar one, but it is subject to the qualification that a separate parol agreement as to any matter not inconsistent with the terms or legal effect of the written agreement, and on which it is silent, may be shown, where it appears that the written instrument was not intended to be a complete and final statement of the whole transaction between the parties. (*Platt v. Aetna Ins. Co.,* 153 Ill. 113; *Town of Kane v. Farrelly,* 192 id. 521; *Seitz v. Brewers' Refrigerating Machine Co.,* 141 U. S. 510.) ..."

The answer of the defendant is, the parol evidence that was offered by the plaintiffs and received by the master was incompetent and also insufficient to establish the plaintiffs' theory, and the defendant points to the plaintiffs' complaint, where it is alleged that the settlement contract of June 25, 1935, was made "solely for the further security of the payment of the indebtedness secured by the two mortgages." The theory was that the half interest in the bankruptcy and reorganization claims transferred and conveyed to the defendant by the agreement, absolute on the face of the agreement, was nevertheless intended only as security for the deficiency decree in the mortgage foreclosure suit. It is the rule, which is supported by the Supreme Court in *Kimmel v. Bundy,* 302 Ill. 514, that—"One claiming a deed absolute in form is a mortgage must establish it by clear and convincing proof." And to the same effect is the case of *Helm v. Boyd,* 124 Ill. 370. So, we are obliged to consider this agreement and determine whether from its provisions a settlement agreement was entered into by the parties and not an agreement to serve as security. As it appears from this record the debt of the plaintiffs to the defendant immediately prior to the agreement was the deficiency decree which

had been entered in the foreclosure suit in Illinois. Of course the parties were perfectly justified in entering into an agreement whereby the parties were to receive a share in the chose in action for the undetermined bankruptcy and reorganization dividends and proceeds, and such undetermined net rents, if any, as it might receive from the redemption period receivership, in payment of the personal obligation of the plaintiffs for the deficiency, and when we come to examine the agreement, we find upon the question of deficiency that the defendant would not pursue any such decree against the plaintiffs personally, although it might obtain the appointment of a receiver in the foreclosure suit for the purpose of collecting the rents of the mortgaged premises during the redemption period, and that at the end of the redemption period, the company undertook to execute and deliver to the plaintiffs a satisfaction of any such deficiency decree and a general release of all claims of the defendant against the plaintiffs ''based upon or arising out of said mortgages''; and further, the defendant obligated itself upon the written request of the plaintiffs to execute a release of the deficiency judgment. So, this was the agreement of the parties, and in the light of the facts surrounding the execution of this contract, the parties to it are bound, and evidence of the character that was offered and received by the master would furnish no material aid, except this: that it would tend to contradict and vary the terms of the agreement. As we have already indicated, this agreement was proposed by the plaintiffs and prepared by their attorney after consultations, and there is no evidence and the plaintiffs do not point to anything which would indicate that they were overreached by any representations that were not true in executing the contract in question.

This court has concluded that the agreement was a final and complete contract free from fraud, duress or mistake. Therefore it is conclusive of the rights of the

parties, and the court was fully justified in not going behind it or making a new contract in place of the one the parties made. The plaintiffs proposed, negotiated and drafted the contract and benefited therefrom, receiving as their own, substantial sums of money as a result of it, and of course the plaintiffs will not be heard to impeach it.

For the reasons stated, the decree dismissing the suit by the court for want of equity is affirmed.

*Decree affirmed.*

DENIS E. SULLIVAN, P. J., and BURKE, J., concur.